## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **GAUTAM IJOOR** )<br>**1603 Leeds Castle Drive** )<br>**Vienna, VA 22182** )<br>**Plaintiff** )<br>  )<br>  )<br>**v.** )<br>  )<br>**CONSUMMATE COMPUTER** )<br>**CONSULTANTS SYSTEMS, LLC** )<br>**d/b/a "C3 Systems"** )<br>**330 Pennsylvania Avenue, SE** )<br>**2nd Floor** )<br>**Washington, DC 20003** )<br>  )<br>**and** )<br>  )<br>**CHARLES M. THOMAS** )<br>**319 Geronimo Road** )<br>**Lusby, MD 20657** )<br>  )<br>**Defendants** )<br>  ) | **CIVIL ACTION NO. 15-1292** |

### COMPLAINT

Plaintiff Gautam Ijoor ("Plaintiff"), by and through his counsel, submits this Complaint against Defendants Consummate Computer Consultants Systems, LLC ("C3 Systems"), and Charles Thomas ("Thomas") (collectively, the "Defendants") for damages and other relief arising out of, *inter alia*, the parties' contractual relationship.

### PARTIES

1.     Plaintiff is an adult resident of the Commonwealth of Virginia.

2.     Defendant C3 Systems is a District of Columbia limited liability company, which provides management consulting, software engineering and other information technology services

primarily to the federal government.  C3 Systems' principal place of business is located in the

District of Columbia at 330 Pennsylvania Avenue, SE, 2nd Floor, Washington, DC 20003.

3.       Defendant, Charles Thomas, is a resident of the State of Maryland and the President

and CEO of C3 Systems.  According to the District of Columbia's Department of Consumer and

Regulatory Affairs, Mr. Thomas serves as C3 Systems' registered agent.

4.       Defendants are alter egos and/or agents of one another and, at all relevant times,

operated as a single business enterprise in the District of Columbia.  As described herein, Defendant

Charles Thomas failed to adhere to corporate formalities, and diverted C3 Systems' funds for his

own personal use.

## JURISDICTION AND VENUE

5.       This Court has jurisdiction to adjudicate the claims asserted in this Complaint

pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of

$75,000.00, and the parties are citizens of different states.

6.       Venue is proper in the United States District Court for the District of Columbia,

pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to this

Complaint occurred in this District and because the Defendants' principal place of business is in this

judicial District.

## FACTS

7.       Mr. Ijoor and Defendant Charles Thomas met in 2009 when Mr. Ijoor worked at an

unrelated firm.  At this firm, Mr. Ijoor was the Vice President of Operations and Mr. Thomas was

the owner of C3 Systems and provided services as an Access Programmer.

8.       Some time thereafter, Defendant Thomas offered Mr. Ijoor a partnership interest in

C3 Systems, in exchange for helping him grow the company.

9.      In or around May of 2009, Mr. Ijoor and Defendant Thomas entered into an

agreement (the "2009 Agreement") by which Defendant, C3 Systems agreed to issue Mr. Ijoor

"employee stock options" equal to a 25% ownership interest in C3 Systems' Management

Consulting Division.

10.     Under the 2009 Agreement, Mr. Ijoor stock options vested in one of two ways: (1)

after he completed five (5) years of employment with C3 Systems; or (2) he would "be fully vested in

every 1% of the above mentioned 25% for every percentage of company's Management Consulting

Division's (includes all Federal Consulting Business) revenue booked by the company as a result of

[Mr. Ijoor's] direct marketing effort. For example, for every 3 million dollar contract revenue

booked by the Company from [Mr. Ijoor's] marketing effort in a given year when the company's

Federal Government Management Consulting Division's revenue was 30 million dollars, [Mr. Ijoor]

would be fully vested in 10% of the above 25%."

11.     Under the 2009 Agreement, if Mr. Ijoor "[left] the company before the five years,"

his total vested stock would be the percentage earned through revenue Mr. Ijoor generated. In other

words, if Mr. Ijoor had generated 10% of revenue, 10% of his stock options would be vested.

12.     Also, under the 2009 Agreement, C3 Systems agreed to pay Mr. Ijoor a bonus of

30% of the "net revenue after covering costs associated with salaries, General and Administrative,

fringe, and overhead on procurement opportunities won due to [Mr. Ijoor's] direct marketing

effort…."

13.     Upon entering into the 2009 Agreement, Mr. Thomas promised Mr. Ijoor he would

become a partner in the company.

14.     In March of 2010, Mr. Ijoor and Defendant Thomas entered into an Independent

Contractor Agreement (herein after, the "March 2010 Agreement"), which provided Mr. Ijoor with

30 percent share in the Net Profits and Net Losses of existing projects that Mr. Ijoor had procured

on behalf of C3 Systems.  A list of the specific projects for which Mr. Ijoor was entitled to a 30%

share of the profits, was attached as Exhibit B to the March 2010 Agreement.

15.     Under the March 2010 Agreement, Mr. Ijoor was entitled to receive a 20 percent

share in the Net Profits and Losses of all future projects procured by Mr. Ijoor.

16.     The March 2010 Agreement did not abrogate or otherwise replace the 2009

Agreement.

17.     By September of 2010, Mr. Ijoor had grown the Management Consulting Division

well over 1,500% and was fully vested in the 25% ownership interest he was entitled to under the

2009 Agreement.

18.     At or around this same time, Mr. Ijoor discussed Mr. Thomas's prior promise that he

would become a formal partner of C3 Systems.

19.     Mr. Thomas again promised that Mr. Ijoor would become a formal business partner

and CEO in C3 Systems. However, because the U.S. Small Business Administration's ("SBA") 8(a)

Business Development Program might "complicate" Mr. Ijoor being named a formal partner in C3

Systems , Mr. Thomas indicated that Mr. Ijoor would have to enter into an employment agreement.

He assured Mr. Ijoor would become a formal business partner in C3 Systems after the expiration of

the C3 Systems' participation in the 8(a) Business Development Program.

20.     Mr. Thomas assured Mr. Ijoor that the terms and benefits of the employment

agreement would be identical to those of a partnership interest and/or agreement to be a partner.

21.     On or around September 15, 2010, Mr. Thomas and Mr. Ijoor entered into an

agreement entitled "Employment Agreement" (the " September 2010 Agreement"), under which

Mr. Ijoor would assume the title of Chief Operating Officer/Senior Vice President.  The September

2010 Agreement expired on July 1, 2014.

22.     Pursuant to the September 2010 Agreement, Mr. Ijoor was compensated as follows: (a) a base salary of $160,000.00, (b) quarterly payments of 3% of the "Management Consulting Division's net work-share of revenue received from" projects that Mr. Ijoor procured, for the first 12 months of those existing projects, (c) a bonus of "3% of the Management Consulting Division's net work-share received for any newly awarded project/contract which [Mr. Ijoor] procure[d]," and (d) 25% of the annual net profits of the Management Consulting Division, as well as responsibility for 25% of any net losses in the Management Consulting Division.

23.     Under the 2010 Agreement, Mr. Thomas specifically promised and agreed to "not take any action which would otherwise reduce the amounts due to the Employee pursuant to this Agreement," and to provide Mr. Ijoor with "quarterly financial statements for the Management Consulting Division, including but not limited to, balance sheets, income statements, and cash flow statements," for the purpose of allowing Mr. Ijoor to fully account for his compensation.

24.     The 2010 Agreement also provided that Mr. Ijoor and C3 Systems would execute a new agreement on or about July 1, 2014, by which C3 Systems would transfer to Mr. Ijoor a 25% ownership interest in the Management Consulting Division.

25.     From 2010 until 2014, primarily due to Mr. Ijoor's work, C3 Systems' revenue grew exponentially; the company was awarded approximately $60 Million in federal government contracts alone.  Under Mr. Ijoor's leadership, C3 Systems enjoyed a 97% employee retention rate, and C3 systems received several awards and earned recognition from leading industry publications and organizations.

26.     Despite Mr. Ijoor's numerous requests and Defendants' clear obligations under the September 2010 Agreement, C3 Systems and Mr. Thomas failed to provide Mr. Ijoor with any "quarterly financial statements for the Management Consulting Division, including but not limited to, balance sheets, income statements, and cash flow statements."

27.     Between 2010 and 2014, upon information and belief, C3 Systems failed to pay Mr. Ijoor significant portions of his earned commissions and or bonuses. Mr. Ijoor estimates that Defendants withheld in excess of 3.5 million in compensation owed to him under the 2010 Agreement.  A more exact number will be obtained after discovery of the financial documents, which Defendants have purposefully withheld from Mr. Ijoor.

28.     Between 2010 and the time of Mr. Ijoor's termination, Defendant Thomas spent little or no time in C3 Systems' offices or conducting C3's business.  Upon information and belief, Defendant Thomas used C3 Systems' funds for his own personal use, including, but not limited to the following:

    a.   From 2010 to 2015, Defendant Thomas used C3 Systems' funds for personal travel for himself and friends and/or family to various countries throughout the world;

    b.   On various occasions, Defendant Thomas used C3 Systems' funds to pay for suites at FedEx Field to watch the Redskins for his personal enjoyment and for the enjoyment of his friends and/or family;

    c.   Defendant Thomas hired a personal assistant with whom he had a romantic relationship and for whom he used C3 Systems' funds to purchase gifts.

    d.   Hired four additional personal assistants to purportedly help him handle functions of the business. A company the size of C3 systems does not need a staff of 5 personal assistants.

29.     Defendant Thomas also made poor business decisions.  For example, in 2010, against the advice of Mr. Ijoor, Defendant Thomas rented 2 office spaces of 3000 to 5000 square feet, respectively, even though there were no more than 5 employees in the company at that time.

30.     Defendant Thomas also willfully diverted funds and resources from the Management Consulting Division (which Mr. Ijoor was in charge of, and from which Mr. Ijoor's share of profits

derived), by assigning work for the Education Services Division to Management Consulting Division Employees, thereby reducing the productivity and revenue-generating potential of Management Consulting Division Employees.

31.     Beginning in or around March of 2014, only a few months before Mr. Ijoor was scheduled to acquire a 25% ownership interest in C3 Systems' Management Consulting Division, Mr. Thomas threatened to terminate Mr. Ijoor's employment with C3 Systems based on frivolous and unsubstantiated accusations of misconduct which were made solely to circumvent C3s obligations to transfer ownership interest to Mr. Ijoor.

32.     On or around March 20, 2014, Defendant Thomas told Mr. Ijoor that he would take responsibility over C3 Systems' product delivery of the Management Consulting Division operations from Mr. Ijoor.

33.     Shortly after Thomas assumed responsibility over C3 Systems' operations, business began to suffer in the following ways, including, but not limited to:

a.  Thomas ended Mr. Ijoor's practice of meeting with C3 Systems' clients on a regular basis;

b.  Thomas ended reviews of C3 Systems' various programs;

c.  Thomas eroded checks and balances that Mr. Ijoor had put in place to streamline decision-making;

d.  Thomas began placing increasing demands on employees, which led to decreased employee morale and high turnover. For example, on or around March of 2014, at Thomas' insistence, C3 Systems moved employees that worked in its Herndon, Virginia office to its principal office in the District.  In addition to increasing commutes for those employees, Thomas increased the hours that each employee was

expected to work, and denied employee requests for flexible schedules and working from home; and

e.   Upon information and belief, Defendant Thomas held a secret meeting with several of Mr. Ijoor's salespersons without Mr. Ijoor's knowledge, and terminated those salespersons.  This resulted in substantial harm to the Management Consulting Division by squandering several contracts that those salespersons were in the process of securing for C3 Systems.

34.   Thomas's willful actions and gross mismanagement directly impacted the Management Consulting Division's profits and, by extension, Mr. Ijoor's compensation.

35.   As the business continued to suffer due to Thomas's mismanagement, and only as Mr. Ijoor's contract term neared its renewal date, in bad faith, Thomas began threatening to terminate Mr. Ijoor.

36.   Prior to that time, Mr. Thomas had never issued Mr. Ijoor a negative review or complained of Mr. Ijoor's performance.  In fact, Mr. Ijoor received a 4% performance increase every year  based on his performance.

37.   On or Around Wednesday, June 18, 2014, and only a few days before Mr. Ijoor was scheduled to acquire a 25% ownership interest in C3 Systems' Management Consulting Division, Mr. Thomas presented Mr. Ijoor with a document entitled "Modification to Employment Agreement" (the "2014 Modification").

38.   On the face of the 2014 Modification, Mr. Ijoor was falsely accused of taking "certain actions" that constituted a breach of the 2010 Agreement, but was never given an explanation of those actions.

39.     The 2014 Modification also noted that C3 Systems would agree to forego terminating Mr. Ijoor for his "actions" in exchange for Mr. Ijoor's agreement to the 2014 Modification.

40.     Thomas verbally threatened that if he did not sign the 2014 Modification, Mr. Ijoor would be terminated and prevented from obtaining employment with any other federal contracting firm due to the strong non-compete restrictions contained in the agreements he previously signed. Mr. Ijoor was given only a few minutes to review and sign the 2014 Modification or face the consequences.

41.     The 2014 Modification made the following pertinent changes to the 2010 Agreement: first, it placed a $350,000.00 cap on Mr. Ijoor's total yearly compensation going forward; second, it made Mr. Ijoor's bonus payments contingent upon C3 Systems' compliance with agreements with third parties; and, lastly, it provided for an expiration date of July 1, 2015, after which C3 Systems would use "commercially reasonable efforts" to give Mr. Ijoor a 25% ownership interest in C3 Systems.

42.     The 2014 Modification did not apply retroactively.

43.     Shortly, after executing the 2014 Modification, and as a result of Mr. Thomas's mismanagement of the business, as detailed above, C3 Systems lost a significant amount of revenue over previous years, and approximately thirty percent (30%) of its corporate employees.

44.     On or around March 23, 2015, Mr. Thomas praised Mr. Ijoor's character and his performance at C3 systems, despite having accused Mr. Ijoor of gross misconduct and threatening to terminate Mr. Ijoor only a few months before.

45.     In or around early 2015, Mr. Thomas again threatened to terminate Mr. Ijoor, and on or around May 4, 2015, Mr. Thomas presented Mr. Ijoor with a document titled "Employment Agreement Term Notification," (the "2015 Notice").

46. Under the 2015 Notice, Mr. Ijoor was informed that "[t]his Agreement will not be renewed due to irreconcilable differences."

47. Mr. Ijoor was also advised that effective July 1, 2015, his position would be eliminated, and that either his employment would be terminated, or that if he achieved a $1,000,000.00 increase in revenue by July 1, 2015, he would remain employed by C3 Systems, but with the title "Director of Business Development" and at a reduced salary of $150,000.00.

48. Under the 2015 Notice, Mr. Ijoor's employment would be "transitioned to 'at will'" and he would be "required" to execute an "Inventions, Non-Disclosure and Non-Competition Agreement," on July 1, 2015.

49. On May 7, 2015, C3 Systems terminated Mr. Ijoor's employment, citing "irreconcilable differences."

50. Since Mr. Ijoor's termination, C3 Systems has failed to pay Mr. Ijoor for approximately 120 hours of unused paid vacation time that he is entitled to, despite his demand for the same.

51. Upon information and belief, prior to and after terminating Mr. Ijoor's employment, Defendants made disparaging remarks to C3 Systems' employees and clients about Mr. Ijoor, purposefully engaging in conduct to damage the professional relationships Mr. Ijoor cultivated while at C3 Systems, and harming Mr. Ijoor's reputation in and around the District and severely injuring Mr. Ijoor's livelihood.

## COUNT ONE
## BREACH OF CONTRACT
### (as to C3 Systems)

52. Plaintiff realleges and incorporates by reference the above paragraphs as if fully set forth herein.

53. Plaintiff fully performed under the terms of the September 2010 Agreement by

increasing C3 Systems' revenue, procuring new contracts for C3 Systems, bringing positive publicity to C3 Systems, and increasing employee retention.

54.     Under the terms of the September 2010 Agreement, Plaintiff was entitled to quarterly payments of 3% of the "Management Consulting Division's net work-share of revenue received from" projects that Plaintiff procured, for the first 12 months of those existing projects, (c) a bonus of "3% of the Management Consulting Division's net work-share received for any newly awarded project/contract which [Plaintiff] procure[d]," and (d) 25% of the annual net profits of the Management Consulting Division.

55.     Also under the terms of the September 2010 Agreement, Plaintiff was entitled to quarterly financial statements and other documents regarding C3 System's finances for the express purpose of verifying Plaintiff's compensation.

56.     Defendant failed to provide Plaintiff with quarterly financial statements or other financial documents from C3 Systems, in breach of the September 2010 Agreement.

57.     Despite Defendant's failure to give Plaintiff financial documents pertaining to C3 Systems, Plaintiff kept his own personal records of estimates of C3 Systems' finances based on C3 Systems' sales and operations.

58.     Based on these records, Defendant failed to pay him significant income that he had earned, in breach of the 2010 Agreement.

59.     Upon discovering Defendant's failure to adequately compensate him, Plaintiff made several requests for C3 Systems' financial documents, which Defendant evaded and/or refused.

60.     Upon information and belief, Defendant intentionally refused to provide Plaintiff with financial documents in order to avoid paying him what he was owed and to mask Defendant Thomas's mismanagement of the business and diversion of C3 Systems' funds for his personal use and the personal use of his friends and/or family.

61.     Upon information and belief, Defendant Charles Thomas, as an agent of C3 Systems, diverted C3 Systems' profits for his own personal use and intentionally damaged the productivity and morale of C3 Systems' Management Consulting Division which decreased Mr. Ijoor's share of C3 Systems' profits, in breach of the provision in the September 2010 Agreement to "not take any action which would otherwise reduce the amounts due to the Employee pursuant to this Agreement."

62.     Defendant C3 Systems failed to compensate Plaintiff for amounts he earned based on the Management Consulting Division's net work-share and/or based on the Management Consulting Division's annual net profits, in breach of the September 2010 Agreement.

63.     Upon information and belief, Defendant C3 Systems failed to pay Plaintiff in excess of 3.5 million dollars in compensation that Plaintiff earned including, but not limited to, bonuses, paid vacation, profit-share and commissions.

64.     Defendant's conduct constitutes a breach of contract for which there is no legal excuse, and such breach has caused damage to Plaintiff in an exact amount to be proven at trial.

## COUNT TWO
## UNJUST ENRICHMENT
### (as to C3 Systems and Charles Thomas)

65.     Plaintiff realleges and incorporates by reference the above paragraphs as if fully set forth herein.

66.     Defendants fraudulently induced Plaintiff to take a position with C3 Systems by promising him a partnership interest in the business.  Defendants knowingly benefited from Plaintiff's expertise, entrepreneurship and business network.  Through Plaintiff's efforts, Defendants experienced a significant increase in revenue, positive publicity and business growth.

67.     Defendants continually made promises to Plaintiff regarding his eventual partnership in C3 Systems in order to induce him to perform, despite having no intention of making Plaintiff a

partner in C3 Systems.

68.     Defendant C3 Systems retained said benefits, and upon information and belief, Defendant Charles Thomas unjustly retained said benefits by diverting C3 Systems' profits generated through Plaintiff's efforts, for his own personal use, grossly mismanaging C3 Systems, and intentionally injuring the Management Consulting Division, thereby reducing the compensation due to Plaintiff.

69.     In addition to unjustly retaining said benefits, Defendants' threatened Plaintiff with termination, falsely accused him of gross misconduct and coerced him into taking actions that would further benefit Defendants under the threat of termination.

70.     Defendants resorted to such misconduct all while publicly praising Plaintiff for his performance, and continually promising Plaintiff a partnership interest in C3 Systems.

71.     It would be unjust for Defendants C3 Systems and Charles Thomas to retain the benefits of Plaintiff's efforts and not compensate Plaintiff for the value of the benefits discussed herein.

72.     As a result of Defendants' conduct, Plaintiff has incurred damages in an amount to be proven at trial.

## COUNT THREE
## PROMISSORY ESTOPPEL
### (as to C3 Systems and Charles Thomas)

73.     Plaintiff realleges and incorporates by reference the above paragraphs as if fully set forth herein.

74.     From the moment that Thomas recruited Mr. Ijoor to help expand C3 Systems' business, he promised Mr. Ijoor that he would give him a partnership interest in C3 Systems.

75.     In various conversations, Thomas made the express promise to make Mr. Ijoor a partner in the business and knew that his promise would induce Mr. Ijoor because Mr. Ijoor

expressed to Thomas that he agreed to join C3 Systems and to continue working with the Company because of the promise of becoming a partner in the business.

76.     Mr. Ijoor reasonably relied on Thomas's and C3 Systems' promises to his detriment by foregoing other business opportunities, by devoting vast amounts of time and energy to expanding C3 Systems' business, which grew 10,000 % through Mr. Ijoor's efforts.  In return for his hard work and dedication, Mr. Thomas reciprocated with mismanagement and diversion of funds and by being uncompensated for the many years he performed above and beyond his duties.

77.     As a result of Defendants' conduct, Plaintiff has incurred damages in an amount to be proven at trial.

## COUNT FOUR
## FRAUDULENT MISREPRESENTATION
### (as to C3 Systems and Charles Thomas)

78.     Plaintiff realleges and incorporates by reference the above paragraphs as if fully set forth herein.

79.     When Defendants recruited Plaintiff to assist in the expansion of C3 Systems, they promised Plaintiff a partnership interest in C3 Systems in exchange for Plaintiff's entrepreneurial skills and success with growing other businesses.

80.     Prior to renegotiating the 2009 Agreement, Defendants reassured Plaintiff that he would have a partnership interest in C3 Systems, but that SBA rules would complicate Plaintiff's designation as a partner but that he would be fully compensated as if he were a 25% partner.

81.     At the time Defendants presented Plaintiff with the 2014 Modification, they again reiterated their promise to Plaintiff to transfer an ownership interest in C3 Systems' business to Plaintiff.

82.     Each of Defendants' representations materially false with respect to Defendants' true intentions, which were to induce Mr. Ijoor's performance with a false promise of a partnership

interest.

83.     Defendants knew the representations were false because they never intended for Plaintiff to acquire a partnership interest in C3 Systems or an ownership interest in any entity related to C3 Systems, nor compensate him as if he were a 25% partner.  These representations were made for the sole purpose of taking advantage of Plaintiff's entrepreneurial and business expansion experience and inducing him to perform his obligations under the contract, even though C3 systems had no intention of performing its obligations.

84.     Upon information and belief, Defendants knew and intended that Plaintiff would rely on the representations and forego other business opportunities.

85.     Plaintiff reasonably relied on Defendants' false representations in deciding to forgo other opportunities and work with C3 Systems and, as a result, Plaintiff suffered damages in an amount to be determined at trial.

**COUNT FIVE**
**NEGLIGENT MISREPRESENTATION**
**(as to C3 Systems and Charles Thomas)**

86.     Plaintiff realleges and incorporates by reference the above paragraphs as if fully set forth herein.

87.     Defendants made false statements of material fact including numerous promises that Plaintiff would acquire an ownership interest in C3 Systems and failed to convey material information to Plaintiff which Defendants were obligated to disclose, including quarterly accountings of C3 Systems' finances as required under the contract.

88.     Plaintiff reasonably relied on the false statements and Defendants' agreement to provide Plaintiff with an accurate accounting of C3 Systems' finances on a quarterly basis.

89.     Defendants' misrepresentations and omissions were material in that they improperly lulled Plaintiff into believing that he would receive an ownership interest in C3 Systems or the value

thereof, which caused Plaintiff to continue performing under the September 2010 Agreement, and prevented Plaintiff from avoiding the damages he has suffered as a result of Defendants' conduct, including unpaid compensation, the value of the promised partnership interest, and other costs Plaintiff incurred.

90.     Not only were Defendants' misrepresentations and omissions material, but they were made with the malicious intent to cover up Defendant Thomas's diversion of funds and mismanagement of C3 Systems.  Defendants concocted various allegations directed at Plaintiff to divert attention from Defendants' conduct in order to circumventing their obligations under the contract at issue, making improper threats, asserting undue influence, damaging Plaintiff's reputation among C3 Systems' employees and clients, and blaming Plaintiff for C3 Systems' decline..

91.     Defendants' conduct was reckless, and Defendants acted in complete disregard for Plaintiff's rights.  Defendants manipulated Plaintiff, kept vital information from him, made material misrepresentations, and targeted him for challenging Defendants' misrepresentations and omission. As such, Defendants' conduct warrants punitive damages to prevent similar conduct in the future.

## COUNT SIX
## BREACH OF FIDUCIARY DUTY
### (as to Charles Thomas)

92.     Plaintiff realleges and incorporates by reference the above paragraphs as if fully set forth herein.

93.     At all relevant times Defendant Thomas represented that he and Plaintiff would create a partnership in C3 Systems.

94.     From the very beginning of their engagement with each other and upon entering into the September 2010 Agreement, the Parties intended that their relationship extend beyond mere contractual obligations to a relationship founded upon trust and confidence.

95.     Pursuant to the September 2010 Agreement, Plaintiff was entitled to a bonus and

commission based on revenues, and 25% of net profits of the Management Consulting Division of C3 Systems.

96.     Defendants were obligated to distinguish Plaintiff's 25% share of profits from their 75% interest, and promised to "not take any action which would otherwise reduce the amounts due to the [Plaintiff] pursuant to this Agreement."

97.     Under the 2010 Agreement, Defendants also promised to provide Plaintiff with "quarterly financial statements for the Management Consulting Division, including but not limited to, balance sheets, income statements, and cash flow statements," for the express purpose of allowing Plaintiff to verify his compensation.

98.     Based on the promises made and the intentions of the parties, Defendants acted as fiduciaries of Plaintiff, who entrusted them to act for Plaintiff's best interests.

99.     Defendants owed Plaintiff a duty of loyalty and care to not take actions that would reduce amounts due to Plaintiff. .

100.    Defendant Thomas breached his duties to Plaintiff by diverting company profits for personal use including using C3 Systems' funds for personal travel for himself and friends and/or family to various countries throughout the world, using C3 Systems' funds to pay for suites at FedEx Field for his personal enjoyment and for the enjoyment of his friends and/or family, and using C3 Systems' funds to purchase gifts for an employee with whom he was romantically involved, thereby improperly reducing the compensation Plaintiff was entitled to.

101.    Upon information and belief, Defendant Thomas intentionally breached his fiduciary duty to not take any actions that would harm Plaintiff's entitlement to C3 Systems' profits by improperly interfering with Management Consulting Division operations, squandering business opportunities, and taking actions that directly harmed C3 Systems' profits such as firing its most productive salespersons.

102.     Defendants breached their fiduciary duties by failing to provide Plaintiff with regular accountings of C3 Systems' finances, so that Plaintiff could see C3 Systems' profits and accurately determine how the profits should be divided between Plaintiff and Defendants.

103.     Defendants breached their fiduciary duties by failing to pay Plaintiff his share of profits and/or his share of any Management Consulting Division contracts that he secured.

104.     Defendants' breaches were the proximate causes of damages to Plaintiff including lost compensation and other damages to be proved at trial.

**COUNT SEVEN**
**VIOLATION OF D.C. CODE § 32-1303**
**(as to C3 Systems)**

105.     Plaintiff realleges and incorporates by reference the above paragraphs as if fully set forth herein.

106.     At all relevant times, Defendant C3 Systems was Plaintiff's employer, and Plaintiff was a C3 Systems employee.

107.     On May 7, 2015, C3 Systems terminated Mr. Ijoor's employment, citing "irreconcilable differences."

108.     Pursuant to D.C. Code § 32-1303, C3 Systems was required to pay Mr. Ijoor all earned wages no later than the working day following his termination.

109.     Since Mr. Ijoor's termination, C3 Systems has failed to pay Mr. Ijoor, wages he has earned including bonuses, commissions, paid vacation, and/or other wages he was entitled to under his employment agreement.  Mr. Ijoor made a demand for the same, but Defendant C3 Systems failed to respond.

110.     As a result of C3 Systems' failure to pay Mr. Ijoor's earned wages, Mr. Ijoor has suffered injuries and C3 Systems must pay, as liquidated damages, the lesser of 10 per centum of the unpaid wages for each working day C3 Systems has and continues to fail to pay Mr. Ijoor's earned

wages, or an amount equal to treble the unpaid wages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that this Court enter judgment against

Defendants as follows:

A.  Damages resulting from the breach of contracts in excess of 3.5 Million dollars and

promises made for an amount to be determined at trial;

B.  An award to Plaintiff for the amount of all unpaid compensation owed and liquidated

damages;

C.  For attorneys' fees, expenses, and costs;

D.  For punitive damages as a result of Defendants' fraudulent, willful and malicious

conduct, and

E.  For such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Date: August 10, 2015                    Respectfully Submitted,

 /s/  *Sundeep Hora*_____
Sundeep Hora (D.C. Bar. No. 472944)
ALDERMAN, DEVORSETZ & HORA PLLC
1025 Connecticut Ave., NW, Suite 615
Washington, D.C. 20036
Tel. 202.969.8220
Fax 202.969.8224
E-mail: shora@adhlawfirm.com

**COUNSEL FOR DEFENDANTS**